**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NORTH CAROLINA FARM BUREAU MUTUAL INSURANCE COMPANY, INC. as subrogee of RONALD WESLEY BASSETT and LISA BASSETT d/b/a BASSETT RACING and as subrogee of BASSETT GUTTERS AND MORE, INC., | ) ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | )          1:19CV513 |
| STRICKLAND'S AUTO & TRUCK REPAIRS, INC., | ) ) ) |
| Defendant-Third Party Plaintiff, | ) ) |
| v. | ) ) |
| RONALD WESLEY BASSETT, LISA BASSEEETT, BASSETT GUTTERS AND MORE, INC., and BR RACING, LLC, | ) ) ) ) ) |
| Third-Party Defendants. | ) |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on a motion for partial summary judgment by Plaintiff

North Carolina Farm Bureau Mutual Insurance Company, Inc. ("Farm Bureau"), as subrogee

of Ronald Wesley Bassett and Lisa Bassett d/b/a Bassett Racing ("Bassett Racing") and as

subrogee of Bassett Gutters and More, Inc. ("Bassett Gutters").[1]  (Docket Entry 20.)  Also

---

[1] Ronald and Lisa Bassett, Bassett Racing and Bassett Gutters are collectively referred herein as the "the Bassetts".

before the Court is Defendant-Third Party Plaintiff Strickland's Auto & Truck Repairs, Inc.'s ("Strickland's Auto") motion for summary judgment. (Docket Entry 27.) Responses have been filed and the matters are ripe for disposition. A brief telephone hearing was held in this matter on February 17, 2021. For the reasons that follow, the undersigned will recommend that Farm Bureau's partial motion for summary judgment be granted in part and denied in part, and Strickland's Auto's motion for summary judgment be granted in part and denied in part.

## I.    PROCEDURAL BACKGROUND

On May 15, 2019, Farm Bureau commenced this action against Strickland's Auto asserting its subrogation rights acquired from insurance payments to the insured—the Bassetts—pursuant to their insurance agreements. (*See* Complaint ¶¶ 55-60, Docket Entry 1.) In its complaint, Farm Bureau alleges three causes of action: (1) negligence, (2) negligence (*res ipsa loquitur*), and (3) breach of warranty/contract under common law and the Uniform Commercial Code ("UCC") as codified in North Carolina and Virginia.[2] (*Id.* ¶¶ 61-102.) On June 10, 2019, Strickland's Auto filed an answer and third-party complaint against Ronald and Lisa Bassett, Bassett Gutters, and BR Racing, LLC. (Answer/Third-Party Compl. (hereinafter "Answer"), Docket Entry 8.)

In their Answer, Strickland's Auto asserts a number of affirmative defenses. (*Id.* at 12-16.)[3] Of note, Strickland's Auto asserts that the settlement resolving the litigation between

_____

[2] Codified in North Carolina as N.C. Gen. Stat. §§ 25-2-714 to -715, and in Virginia as Va. Code Ann. §§ 8.2-714 to -715. Both sets of statutes contain identical language.

[3] All citations in this recommendation to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

2

the Bassetts and Strickland's Auto ("the Bassett Action")[4] includes a release from Farm Bureau's subrogation claim. (*Id.* at 12-13; *see also* Release ("the Release"), Ex. 3 to Ans., Docket Entry 8-3.) Farm Bureau filed a motion for partial summary judgment on Strickland's Auto's First, Third, and Fourth affirmative defenses[5] on April 16, 2020. Strickland's Auto filed a motion for summary judgment on July 8, 2020.

## II.   FACTUAL BACKGROUND

A.   <u>The Underlying Incident</u>

Ronald and Lisa Bassett owed property in Winston-Salem, North Carolina where they operated Bassett Racing and Bassett Gutters. (Compl. ¶¶ 13, 15, 17; Barry Fountain Affidavit ¶¶ 2-3, Docket Entry 22.) On the Bassett's property, there was a large metal building ("the Garage") where the Bassetts and Bassett Racing stored and maintained race cars and specialized machines, tools, supplies, equipment, parts, and other personal property. (Compl. ¶ 16; Fountain Aff. ¶ 4.) In or around May 2016, Bassett Gutters owned a 2005 Freightliner tractor ("the Tractor") that was used by the Bassetts to haul race cars, equipment, parts, and supplies. (Compl. ¶ 18; Fountain Aff. ¶ 7.)

In or about April 2016, the Tractor engine became inoperable. (Compl. ¶ 24.) Ronald Bassett agreed to purchase a used replacement engine from Strickland's Auto, and both further agreed that Strickland's Auto would perform the necessary labor to remove the inoperable engine and install the replacement engine in the Tractor (the "Transaction"). (*Id.* ¶¶ 25-29.)

---

[4] *See Bassett v. Strickland's Auto & Truck Repairs, Inc.*, Civil No. 17-cv-590-WO-JLW (M.D.N.C. 2017). The complaint in the Bassett Action has been filed in the instant matter (*see* Docket Entry 8-2) and will be referred to as "the Bassett Action Complaint."
[5] Strickland's Auto's First, Third, and Fourth affirmative defenses are further described in Part IV of the Recommendation herein.

3

To memorialize the agreement, Ronald Bassett signed a Repair Order on April 13, 2016. (Repair Order, Docket Entry 1-1.) The Repair Order included the following language: "60 Day WARRANTY Against Major Engine Failure Warranty does not include oil leaks, tow bills, downtime or labor. For warranty to be applicable engine must be returned to Strickland's Auto & Truck." (*Id.*)

Once the engine replacement was completed, on April 29, 2016, Ronald Bassett and Shane Hendricks, a friend and/or agent of the Bassetts, retrieved the Tractor from Strickland's Auto and drove it back to the Bassetts' property, parking the tractor outside of the Garage. (Comp. ¶¶ 39-40; Bassett Gutters' Interrog. Resp. No. 6, Docket Entry 27-6 at 5; Ronald Bassett's Interrog. Resp. No. 5, Docket Entry 27-7 at 4.) On May 20, 2016, Ronald Bassett washed and moved the Tractor into the Garage. (Compl. ¶ 41; Ronald Bassett's Interrog. Resp. No. 7, Docket Entry 27-7 at 5.) Within an hour of the Tractor being moved into the Garage, there was an explosion on the Bassett property, and the resulting fire consumed the Garage. (Compl. ¶ 42.) There were neighbors who heard the explosion, but no one was in the Garage at the time of the fire. (*Id.* ¶ 44; Ronald Bassett's Interrog. Resp. No. 9, Docket Entry 27-7 at 7.) The fire destroyed the Tractor, the Garage, and personal property inside the Garage belonging to the Bassetts. (Compl ¶ 47.) The Bassetts never returned the Tractor engine to Strickland's Auto. (*See id.* ¶ 95.)

At the time of the underlying incident, Farm Bureau was the insurance provider for the Bassetts. (Compl. ¶¶ 2-3, 55.) Specifically, Farm Bureau issued a business automobile insurance policy to Bassett Gutters, and a commercial lines and commercial property insurance policy to Ronald and Lisa Bassett and Bassett Racing. (Fountain Aff. ¶¶ 5, 6; Insurance

Policies, Docket Entries 22-1, 22-2.) Pursuant to their insurance policies, Farm Bureau paid the Bassetts $746,063.59 for losses incurred from the fire. (Fountain Aff. ¶ 10.) Three separate payments were made by check to the Bassetts dated June 2, 2016, June 21, 2016, and August 1, 2016. (*See id.*; Farm Bureau Checks, Docket Entry 22-3.) The Bassetts' total claimed damages, however, were in excess of the limits of the business automobile and the commercial lines property insurance policies issued by Farm Bureau. (Fountain Aff. ¶ 11.) Thus, Farm Bureau's payment to the Bassetts partially, not fully, compensated the Bassetts for their damages arising from the fire. (Compl. ¶ 58.)

B.    The Settlement from the Bassett Action

On June 27, 2017, the Bassetts filed a complaint in this Court against Strickland's Auto to initiate the Bassett Action. (Bassett Action Complaint, Docket Entry 8-2.)[6] The Bassetts alleged that the fire occurred as a result of Strickland's Auto's work on the Tractor, asserting similar negligence and breach of warranty claims against Strickland's Auto as Farm Bureau asserts in this action. (*Id.* ¶¶ 58-105.) Farm Bureau was not a party to the Bassett Action, but its attorneys did participate in some aspects of the litigation, including attending some depositions and participating telephonically at mediation. (Fountain Aff. ¶ 13.) However, Farm Bureau never formally intervened in the Bassett Action.

After some discovery and mediation, the parties in the Bassett Action agreed to settle, and pursuant to the settlement, Strickland's Auto paid the Bassetts $900,000.00 in exchange for dismissal of the Bassett Action and Release of all claims ("the Release"). (Release, Docket

---

[6] The named Plaintiffs in the Bassett Action were Ronald and Lisa Bassett, Bassett Gutters, and BR Racing, LLC. "Ronald Wesley Bassett and Lisa Bassett d/b/a Bassett Racing" was not a named plaintiff in the Bassett Action.

Entry 8-3.) The first paragraph of the Release includes a release and discharge of Strickland's Auto:

> of and from any and all actions, causes of action, claims, demands, damages, costs, loss of services, loss of consortium, expenses, compensation, and all consequential damage on account of, or in any way growing out of, any and all known and unknown personal injuries and damages resulting or to result from an incident/fire that occurred on or about the 20th day of May, 2016, in the City of Winston-Salem, Forsyth County, North Carolina.

(*Id.* at 1.) The third paragraph of the Release includes the following language:

> It is further agreed that the [Bassetts] shall pay or cause to be paid any and all valid liens against these funds out of these funds whether such lien arises by operation of law, agreement, or otherwise, including but not limited to North Carolina Farm Bureau Mutual Insurance Company's property damages subrogation claim . . . .

(*Id.*)

The Bassetts accepted the settlement and cashed the check, dismissing the case with prejudice. (Bassett Action Stipulation of Dismissal, Docket Entry 8-4.) Included with the settlement check was an enclosure letter stating the following: "[t]he settlement funds are also provided to you . . . with the understanding that all outstanding liens are to be satisfied out of the funds, including the lien of North Carolina Farm Bureau Mutual Insurance Company, as set forth in the Release." (Enclosure Letter, Docket Entry 27-9.)

## III. SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary

6

judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *Anderson,* 477 U.S. at 248-49. "When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations and citation omitted).

7

## IV.  DISCUSSION

### A.  <u>Farm Bureau's Partial Motion for Summary Judgment</u>

Farm Bureau moves for partial summary judgment on Strickland's Auto's First, Second, and Third affirmative defenses.  (Docket Entry 20.)  Strickland's Auto's First affirmative defense alleges that the Release (in the Bassett Action), signed by the Bassetts and in exchange for paying all valid liens, bars Farm Bureau from pursuing its claims.  (Answer at 12-13, Docket Entry 8.)  Strickland's Auto's Second affirmative defense alleges accord and satisfaction as a bar to Farm Bureau's claims.  (*Id.* at 13.)  Next, Strickland's Auto's Third Affirmative Defense alleges that, due to the Bassetts' settlement, the laws of subrogation and its equitable principles act as a complete bar to Farm Bureau's claim.  (*Id.* at 13-14.)  Farm Bureau contends that it is subrogated to the Bassetts' rights against Strickland's Auto as a result of Farm Bureau's payments made under the insurance policies.  (Docket Entry 21 at 5-6.)  Thus, neither the Bassetts' acceptance of a settlement with Strickland's Auto, the Release, nor any defenses predicated thereon are effective to waive Farm Bureau's subrogation rights.  (*Id.* at 6-12.)

#### 1.  Farm Bureau's Subrogation Rights

"Subrogation permits an insurer to step into the shoes of its insured to recover from a third-party who is liable for any amounts paid by the insurer to the insured."  *Atl. Specialty Ins. Co. v. Blue Cross & Blue Shield of N. Carolina*, No. 1:19CV343, 2020 WL 5366287, at *6

8

(M.D.N.C. Sept. 8, 2020) (unpublished). North Carolina law[7] has recognized both conventional and equitable subrogation:

> The general rule is that upon payment of a loss, pursuant to the terms of its contract of insurance, the insurer, or insurers in the case of coinsurance, are entitled to be subrogated pro tanto to any right of action which the insured may have against a third party whose negligence or wrongful act caused the loss. The right of an insurer to be thus subrogated to the rights of the insured may be either the right of conventional subrogation––that is, subrogation by agreement between the insurer and the insured—or the right of equitable subrogation, by operation of law, upon the payment of the loss.

*Milwaukee Ins. Co. v. McLean Trucking Co.*, 256 N.C. 721, 726, 125 S.E.2d 25, 29 (1962). *See also N. Carolina Ins. Guar. Ass'n v. Century Indem. Co.*, 115 N.C. App. 175, 188, 444 S.E.2d 464, 472 (1994) (defining equitable subrogation as "a device . . . to compel the ultimate discharge of an obligation by him who in good conscience ought to pay it and arises when one person has been compelled to pay a debt which ought to have been paid by another and for which the other was primarily liable.") (internal quotations and citation omitted). North Carolina law recognizes "well-settled law that an insurer paying a loss by fire under the obligations of its policy is entitled to subrogation to the rights of insured against persons whose fault or negligence caused the loss, to the extent of the loss paid . . . under equitable principles." *Gen. Ins. Co. of Am. v. Faulkner*, 259 N.C. 317, 324, 130 S.E.2d 645, 651 (1963).

Generally, "there is no right to subrogation until the insurance is paid, and that when the right once attaches it cannot be destroyed or extinguished by a release or discharge

---

[7] Choice of law principles appear to be undisputed as both parties apply North Carolina law to the claims herein, and do not assert otherwise. The undersigned thus applies North Carolina law to this recommendation.

executed by the insured." *Powell & Powell v. Wake Water Co.*, 171 N.C. 290, 88 S.E. 426, 430 (1916). Thus, "a tort-feasor may not defeat an insurance carrier's subrogation rights when he has knowledge of the subrogated claim and thereafter secures a consent judgment or release from the injured or damaged party." *State Farm Mut. Auto. Ins. Co. v. Blackwelder*, 103 N.C. App. 656, 658, 406 S.E.2d 301, 302 (1991) (citation omitted), *aff'd*, 332 N.C. 135, 418 S.E.2d 229 (1992). *See also Nationwide Mut. Ins. Co. v. Canada Dry Bottling Co.*, 268 N.C. 503, 508, 151 S.E.2d 14, 17 (1966)*; Nationwide Mut. Insurance Co. v. Spivey,* 259 N.C. 732, 734, 131 S.E.2d 338, 340 (1963); *Phillips v. Alston*, 257 N.C. 255, 259, 125 S.E.2d 580, 583 (1962). However, "if an insured settles with or releases a wrongdoer from liability for a loss *before* payment of the loss has been made by the insurance company, the insurance company's right of subrogation against the wrongdoer is thereby destroyed." *Markham v. Nationwide Mut. Fire Ins. Co.*, 125 N.C. App. 443, 449, 481 S.E.2d 349, 353 (1997) (emphasis added) (internal quotations and citation omitted); *see also Lexington Ins. Co. v. Tires Into Recycled Energy and Supplies, Inc.*, 136 N.C. App. 223, 522 S.E.2d 798 (1999); *Hilley v. Blue Ridge Insurance Co.*, 235 N.C. 544, 549, 70 S.E.2d 570, 574 (1952). This follows the principle that an insurer's subrogation rights may not be greater than the rights of the insured. *Fid. Ins. Co. v. Atl. Coast Line R. Co.*, 165 N.C. 136, 80 S.E. 1069, 1070 (1914). The Supreme Court in North Carolina explained:

> While an insurer, who has paid a loss to the insured, is subrogated to the rights of the latter, as against tort-feasors responsible for the destruction of the property insured, yet the underwriter [insurer] does not and cannot acquire by subrogation any rights which the assured himself could not enforce. There is no privity or legal relation between the insurer and the tort-feasor, and every right the former can possibly acquire must come through the insured, and is subject to every defense and limitation which could be interposed against the owner of the property. The rights

10

of the underwriter [insurer] cannot be greater nor different than those of the insured.

*Id.* (citation omitted). *See also Allstate Insurance Co. v. Old Republic Insurance Co.,* 49 N.C. App. 32, 38, 270 S.E.2d 510, 514 (1980) (insurer may not be subrogated to greater rights than possessed by insured).

As a threshold matter, the undersigned finds it appropriate to first address Strickland's Auto's argument regarding the existence of subrogation rights pertaining to BR Racing, LLC. (*See* Docket Entry 30 at 7-8.) In its reply brief, Strickland's Auto contends that "Farm Bureau has not set forth facts to establish, as a matter of law, a subrogation interest for BR Racing, LLC's claims. . . ." and "[t]herefore, Farm Bureau is not subrogated to the rights of BR Racing, LLC for its alleged damages arising out of the fire and cannot assert that its subrogation interest includes BR Racing, LLC's damages alleged in the Bassetts' Lawsuit." (*Id.*) Strickland's Auto relies on the fact that Farm Bureau did not issue an insurance policy directly to the entity BR Racing, LLC and that Farm Bureau did not issue any payment directly to the entity BR Racing, LLC after the fire. (*See* Insurance Policies, Docket Entries 22-1, 22-2; Farm Bureau Checks, Ex. C, Docket Entry 22-3.) Farm Bureau argues that Strickland's Auto's attempts to create a material distinction between BR Racing, LLC and Bassett Racing, which have largely been treated the same for purposes of this litigation, are further efforts to avoid liability. (Docket Entry 32 at 2.) During the telephone hearing, Farm Bureau's counsel conceded, which the Court's record reflects, that Farm Bureau's relevant insurance policy is issued to Ronald and Lisa Bassett d/b/a Bassett Racing. (*See* Insurance Policy, Docket Entry 22-2.) Counsel further indicated that payment was not issued to BR Racing, LLC, but instead to the Bassetts "d/b/a Bassett Racing" pursuant to the policy. Strickland's Auto's counsel

11

argued that these are distinct legal entities and ultimately BR Racing, LLC incurred the majority of the loss in the fire, but was not an entity insured by Farm Bureau.

After consideration of the record before the Court and the parties' arguments, the undersigned concludes that the claims related to any purported subrogation interests of "Ronald Wesley Bassett and Lisa Bassett d/b/a Bassett Racing" cannot be determined at this juncture because there are genuine issues of material fact as to whether any such subrogation interest exists. While Farm Bureau argues that Ronald Wesley Bassett and Lisa Bassett d/b/a Bassett Racing and BR Racing, LLC are essentially the same entity, general legal characteristics of joint ventures/partnerships[8] and limited liability companies do not support Farm Bureau's arguments. Ronald and Lisa Bassett d/b/a Bassett Racing is akin to Ronald and Lisa Bassett acting as joint venturers or partners, and doing business as Bassett Racing. However, "[u]se of the words 'doing business as' does not create an entity distinct from the individual[s]," *see Haynie v. Cobb*, 207 N.C. App. 143, 145, 698 S.E.2d 194, 196 n.1 (2010) (citation omitted), in which such joint individuals would generally otherwise remain personally liable. *See Alexander v. Diversified Ace Servs. II, AJV*, No. 1:11CV725, 2014 WL 502496, at *7 (M.D.N.C. Feb. 7, 2014) (citing N.C. Gen. Stat. § 59-45(a) (2013)) ("With limited exceptions, all partners are jointly . . . liable for the acts and obligations of a partnership formed under North Carolina law. A joint venture operates similarly, in that the torts of one member of a joint venture may

---

[8] A joint venture "is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit[.]" *Pike v. Wachovia Bank & Tr. Co.*, 274 N.C. 1, 8, 161 S.E.2d 453, 460 (1968). "A joint venture is a kind of partnership and is governed by substantially the same rules that govern partnerships." *New Friendship Used Clothing Collection, LLC v. Katz*, No. 16 CVS 14819, 2017 WL 3601714, at *10 (N.C. Super. Aug. 18, 2017) (citation omitted) (unpublished).

be imputed to another member of the same joint venture."). To the contrary, "[a]n LLC is a statutory form of business organization . . . that combines characteristics of business corporations and partnerships." *S. Shores Realty Servs., Inc. v. Miller*, 251 N.C. App. 571, 584, 796 S.E.2d 340, 351 (2017) (internal quotations and citation omitted). "[A]s its name implies, limited liability of the entity's owners, often referred to as 'members,' is a crucial characteristic of the [limited liability company] form, giving members the same limited liability as corporate shareholders." *Hamby v. Profile Prods., L.L.C.,* 361 N.C. 630, 636, 652 S.E.2d 231, 235 (2007).

During the hearing, Farm Bureau's counsel states that Farm Bureau possibly insured Ronald and Lisa Bassett d/b/a Bassett Racing prior to 2013, at which time BR Racing, LLC was formed, and such change was never corrected with the insurance documents. Ultimately, while further development of the record may establish with greater certainty that these two entities are in fact one in the same (or one being an extension of the other), the record now before the Court does not do so. Therefore, as there are genuine issues of material fact as to whether any such subrogation interest exists pertaining to "Ronald Wesley Bassett and Lisa Bassett d/b/a Bassett Racing," the Court's remaining analysis regarding the parties' cross-motion arguments on Strickland's Auto's affirmative defenses relate solely to the subrogation interests pertaining to Bassett Gutters.[9]

---

[9] With regard to Strickland's Auto's arguments seeking dismissal of Farm Bureau's negligence, negligence (*res ispa loquitur*) and breach of warranty/contract claims, the Court's conclusion remains the same irrespective of whether Farm Bureau establishes a subrogation interest for "Ronald and Lisa Bassett d/b/a Bassett Racing." This is because Farm Bureau has been subrogated to the rights of Bassett Gutters, and any additional subrogation rights would not alter the Court's analysis. Thus, as further explained herein, Farm Bureau's first cause of action should not be dismissed, its second

13

Here, Farm Bureau issued three payments to the Bassetts on June 2, 2016; June 21, 2016; and August 1, 2016, respectively. (Fountain Aff. ¶ 10, Docket Entry 22.) Therefore, Farm Bureau's subrogation rights for the full amount of the losses paid to the Bassetts ($746,063.59), arose and existed not later than August 1, 2016, the date of the last payment under the insurance policies. At that point, Farm Bureau was subrogated to the Bassetts' rights as they existed at the time of the last payment, and the Bassetts could not subsequently modify or waive such rights. *Hinson v. Davis*, 220 N.C. 380, 17 S.E.2d 348, 350 (1941) ("This subrogated right in the insurance carrier could not by any act of the employer be altered or changed. Any modification or waiver of rights under subrogation to be effectual must be made by the subrogee and not by the subrogor.").

## 2. Strickland's Auto's First, Second, & Third Defenses

Strickland's Auto's First, Second, and Third Affirmative Defenses are based upon actions of the Bassetts after the payments were issued by Farm Bureau. More specifically, the Bassetts' settlement of the Bassett Action (of which Farm Bureau was not a party) and the timing of the Release occurred in May 2019, nearly three years after Farm's Bureau's subrogation rights were effective. (*See* Release, Docket Entry 8-3.) Thus, the settlement and Release could not have waived Farm Bureau's subrogation rights because the actions of the Bassetts could not, three years later, alter Farm Bureau's rights. *Hinson*, 220 N.C. at 380, 17 S.E.2d at 350.

cause of action still fails as a matter of law, and its third cause of action has issues reserved for the jury.

Moreover, Farm Bureau correctly argues that Strickland's Auto cannot defend the instant action based on the Release where it had actual knowledge of Farm Bureau's subrogation rights prior to execution of the Release. *Blackwelder*, 103 N.C. App. at 658, 406 S.E.2d at 302. In its briefing, Strickland's Auto itself acknowledges its awareness of Farm Bureau's payments to the Bassetts when Strickland's Auto negotiated its settlement with the Bassetts. (*See* Docket Entry 25 at 11 ("Strickland was aware of Farm Bureau's payments[.]); *see also* Ronald Bassett's Interrog. Resp. Nos. 17-18, Docket Entry 25-5 at 14-15.).) Furthermore, the very document on which Strickland's Auto relies to defeat Farm Bureau's claims—the Release—specifically refers to Farm Bureau's claims. (*See* Release at 1, Docket Entry 8-3 ("It is further agreed that the [Bassetts] shall pay or cause to be paid any and all valid liens against these funds . . . including but not limited to North Carolina Farm Bureau Mutual Insurance Company's property damages subrogation claim . . . .").) Thus, "[a]fter the [Bassetts] received [partial] payment [from Farm Bureau] under [the insurance] polic[ies], [Strickland's Auto], having knowledge of this fact, cannot defeat [Farm Bureau's right to subrogation[] by any settlement with the [Bassetts]." *Canada Dry*, 268 N.C. at 508, 151 S.E.2d at 17; *Wichnoski v. Piedmont Fire Prot. Sys., LLC*, 251 N.C. App. 385, 397, 796 S.E.2d 29, 38-39 (2016) ("Because all third-party defendants in the present case know of [insurer's] subrogation rights as a result of [insurer's] efforts to intervene in the action, a settlement between Plaintiffs and some or all of the defendants would not necessarily preclude [insurer] from asserting its subrogation rights against the defendants."); *Blackwelder*, 103 N.C. App. at 658, 406 S.E.2d at 302. Therefore, Strickland's Auto's First and Third Affirmative Defenses

15

related to settlement, release, and Farm Bureau's subrogation rights pertaining to Bassett Gutters should be dismissed.

Similarly, Strickland's Auto's Second Affirmative Defense alleging accord and satisfaction as a bar to Farm Bureau's claims should be dismissed. It, too, is premised on the Bassetts' acceptance of the settlement in the Bassett Action *after* Farm Bureau issued payments to the Bassetts under the insurance policies. North Carolina law defines accord as "an agreement whereby one of the parties undertakes to give or perform, and the other to accept, in satisfaction of a claim, liquidated or in dispute, and arising either from contract or from tort, something other than or different from what he is, or considers himself, entitled to[,] " and satisfaction—"the execution, or performance, of such an agreement." *Dobias v. White*, 239 N.C. 409, 413, 80 S.E.2d 23, 27 (1954) (internal quotations and citation omitted). The "agreement" here is the settlement in the Bassett Action between the Bassetts and Strickland's Auto, in which Farm Bureau participated but was not a party. The North Carolina Supreme Court has held that "[a]ny 'accord, settlement and satisfaction' between the [insured] and the defendant . . . effected no rights to which the [insurer] . . . had been subrogated, and could not be properly pled as a defense to an action by . . . the [insurance] company against the defendant." *Hinson*, 220 N.C. at 380, 17 S.E.2d at 350. The injured party in the pending matter, Farm Bureau, is not the injured party in the Bassett Action, and is thus not barred under the doctrine of accord and satisfaction. Therefore, Strickland's Auto's Second Affirmative Defense should also be dismissed.

Strickland's Auto's arguments to the contrary are unpersuasive. It first argues that Farm Bureau is bound by the Release because Farm Bureau has no greater rights than the

Bassetts. (Docket Entry 25 at 7-8, 15.) While is it true that the insurer's subrogation rights cannot be greater than the rights of the insured, *see Fid. Ins. Co.*, 165 N.C. 136, 80 S.E. at 1070, what is nevertheless crucial to this determination of the type of rights acquired is the *time* at which such rights were acquired. The right of subrogation generally arises at the time the insurer makes payment to the insured, *Milwaukee Ins. Co.*, 256 N.C. at 726, 125 S.E.2d at 29, and at such time, the insurer is "subrogated to all the rights existing in favor of the [insured] against defendant[.]" *Hinson*, 220 N.C. 380, 17 S.E.2d at 350. Here, Farm Bureau is only subject to any defenses—in particular here, settlement, release, and accord and satisfaction— against the Bassetts that would have accrued *before* the right of subrogation arose by payment of the insurance proceeds. No such defenses existed at the time Farm Bureau's subrogation rights arose. And the Bassetts' subsequent actions after Farm Bureau's subrogation rights arose did not alter those rights. *See Powell & Powell*, 171 N.C. at 290, 88 S.E. at 430 ("[W]hen the [subrogation] right once attaches it cannot be destroyed or extinguished by a release or discharge executed by the insured."). Strickland's Auto's argument thus fails.

Next, Strickland's Auto argues that Farm Bureau should be estopped from pursuing its subrogation rights against Strickland's Auto. (Docket Entry 25 at 8-11.) "'Estoppel' is an affirmative defense that a party must state affirmatively in responsive pleading." *NOA, LLC v. El Khoury*, No. 5:14-CV-114-FL, 2017 WL 11566799, at *6 (E.D.N.C. Sept. 5, 2017) (citing Fed. R. Civ. P. 8(c)). Strickland's Auto did not raise estoppel in its Answer. (*See* Answer, Docket Entry 8.) However, "absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived when it is first raised in a pre-trial dispositive motion[.]" *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999).

17

The North Carolina Supreme Court held:

> Estoppel by misrepresentation or equitable estoppel grows out of such conduct of a party as absolutely precludes him, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of contract or of remedy.

*Scott v. Bryan*, 210 N.C. 478, 187 S.E. 756, 757 (1936). The essential elements of equitable estoppel are:

> "(1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3) knowledge, actual or constructive, of the real facts. The party asserting the defense must have (1) a lack of knowledge and the means of knowledge as to the real facts in question; and (2) relied upon the conduct of the party sought to be estopped to his prejudice."

*White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 305, 603 S.E.2d 147, 162 (2004) (internal quotations and citation omitted).

Strickland's Auto presents no more than a conclusory argument of estoppel. Strickland's Auto asserts that Farm Bureau "was aware of and was even updated" about the status of the Bassett Action by virtue of Farm Bureau's counsel's appearance at a deposition, and also aware of mediation but refused to participate.[10] (Docket Entry 25 at 10; *see also* List

---

[10] Farm Bureau was not *required* to intervene in the Bassett Action, nor required to participate in mediation proceedings as a non-party. *See Taylor v. Green*, 242 N.C. 156, 158, 87 S.E.2d 11, 13 (1955) ("when [insurer] pays the insured in part . . ., the [insurer] is subrogated . . . to the rights of the insured against the tort feasor and . . . becomes a proper although not a necessary party to the litigation"); *Burgess v. Trevathan*, 236 N.C. 157, 160, 72 S.E.2d 231, 233 (1952) ("The insured may recover judgment against the tort-feasor in such case for the full amount of the loss without the

of Appearances at Ivan Ruman Collins Dep., Docket Entry 25-4 at 3.) However, Strickland's Auto provides no evidence showing that it relied upon Farm Bureau's representations or conduct to enter a settlement and execute a Release with the Bassetts. Moreover, if Strickland's Auto assumed that Farm Bureau "would recover its proportionate amount of the settlement funds from the Bassetts[,]" (*see* Docket Entry 25 at 9), it could have simply ascertained the truth of such fact. *See Smith v. HBE Corp.*, 655 F. Supp. 59, 66-67 (E.D.N.C. 1986) (citation omitted) ("[H]e who claims the benefit of an equitable estoppel on the ground that he has been misled by the representations of another must not have been misled through his own want of reasonable care and circumspection."), *aff'd*, 811 F.2d 1505 (4th Cir. 1987); *Hawkins v. M & J Fin. Corp.*, 238 N.C. 174, 179, 77 S.E.2d 669, 673 (1953) ("[E]stoppel ordinarily will be denied where the party claiming it was put on inquiry as to the truth and had available the means for ascertaining it."). Indeed, "a tortfeasor cannot expect to rely on a release from the victim if he or she knows that equity has transferred a portion of the victim's claim into the hands of a third party, who has paid part of what the tortfeasor by rights should pay." 44A Am. Jur. 2d Insurance § 1792. Therefore, Strickland's Auto's argument fails.

Likewise, Strickland's Auto's remaining arguments fail. To the extent it argues that Farm Bureau's knowledge of the Release precludes its ability to assert subrogation rights, this argument too fails. What is relevant here is *Strickland's Auto's* knowledge of Farm Bureau's subrogation rights prior to execution of the settlement and Release. *See Wichnoski*, 251 N.C. App. at 397, 796 S.E.2d at 38-39; *Blackwelder*, 103 N.C. App. at 658, 406 S.E.2d at 302; *Canada*

---

joinder of the insurance company."); *see also* Middle District Local Rule 83.9e(d) (requiring a "representative of the insurance carrier for any party against whom a claim is made").

19

*Dry*, 268 N.C. at 508, 151 S.E.2d at 17; *accord* 44A Am. Jur. 2d Insurance § 1793 ("[I]f the wrongdoer settles with the insured after such a payment without the consent of the insurer and with knowledge of the insurer's payment and right of subrogation, the insurer's right to subrogation is not defeated by the settlement."). Strickland's Auto also argues that the Bassetts are responsible for any payment to Farm Bureau. (Docket Entry 25 at 11-14.) That may be true in instances where an insured holds proceeds of a judgment, for the benefit of the insurer, for the full amount of the loss. *See e.g.*, *Burgess*, 236 N.C. at 160, 72 S.E.2d at 233 ("The insured may recover judgment against the tort-feasor . . . for the full amount of the loss without the joinder of the insurance company [but] [h]e holds the proceeds of the judgment, however, as a trustee for . . . the insurance company to the extent of the insurance paid by it."); *Fid. Ins. Co.*, 165 N.C. 136, 80 S.E. at 1072 ("But if [the insured] had recovered of defendant the full value of his property, the [insurers] would have only the right to hold [the insured] as a trustee for their benefit to the extent of the insurance money paid. They could not recover of the defendant."). However, such circumstances are not applicable here as the Bassett Action was not pursued to judgment, but rather ended in settlement, and Strickland's Auto's Release only accounted for approximately one-third of the Bassetts' total losses. *See* Docket Entry 25 at 13; *see also Canada Dry*, 268 N.C. at 507, 151 S.E.2d at 17 (citation omitted) (with knowledge of insurer's subrogation rights, a tort-feasor's payment made to insured and "release taken will be construed as a mere adjustment of the uncompensated portion of the loss. Insurer may then assert its right against the Tort-feasor."). Lastly, Strickland's Auto argues that Farm Bureau is bound pursuant to the doctrine of accord and satisfaction. (Docket Entry 25 at 14-15.) For the reasons previously discussed herein, this argument fails.

In sum, for the reasons previously discussed, Farm Bureau's motion for partial summary judgment should be granted in part and Strickland's Auto's First, Second, and Third Affirmative Defenses as they relate to the Farm Bureau's subrogation rights pertaining to Bassett Gutters should be dismissed as a matter of law.

## B. Strickland's Auto's Motion for Summary Judgment

### 1. Strickland's Auto's First, Second, and Third Affirmative Defenses

Strickland's Auto also moves for summary judgment on its First, Second, and Third Affirmative Defenses. Strickland's Auto's arguments are similar to those made in opposition to Farm Bureau's' motion. (*See* Docket Entry 28 at 12-15.) To such extent, for the reasons previously discussed, those affirmative defenses should be dismissed as they relate to the Farm Bureau's subrogation rights pertaining to Bassett Gutters. Strickland's Auto also argues that the Release is valid and enforceable against Farm Bureau based upon general contractual principles governing releases under North Carolina law. (*Id.* at 7-11.) Again, Strickland's Auto's argument misses the mark. As previously discussed, prior to the execution of the Release, Farm Bureau's subrogation rights were already perfected; thus, the Bassetts' subsequent conduct could not waive or release said rights. *See Powell & Powell*, 171 N.C. at 290, 88 S.E. at 430. Moreover, because Strickland's Auto was aware of Farm Bureau's subrogation rights at the time it executed the Release, Strickland's Auto cannot now use the Release as a defense against Farm Bureau. *See Blackwelder*, 103 N.C. App. at 658, 406 S.E.2d at 302; *Canada Dry*, 268 N.C. at 508, 151 S.E.2d at 17.

## 2. Farm Bureau's Negligence (*Res Ipsa Loquitur*) Claim

Strickland's Auto next contends that Farm Bureau's second cause of action—negligence under the doctrine of *res ipsa loquitur*—should be dismissed because Strickland's Auto was not in the possession, control or management of the Tractor at the time of the underlying incident. (Docket Entry 28 at 16-18.) Strickland's Auto alleges that, because the fire started almost three weeks after it relinquished control of the Tractor to the Bassetts (or an agent of the Bassetts), the doctrine of *res ipsa loquitur* is inapplicable to the facts before the Court. (*Id.* at 17.)

Under the principle of *res ipsa loquitur*,

> [w]hen an instrumentality which caused an injury to plaintiff is shown to be under the control and operation of the defendant, and the accident is one which, in the ordinary, course of events, does not happen if those who have the management of it use the proper care, the occurrence itself is some evidence that it arose from want of care.

*Kekelis v. Whitin Mach. Works*, 273 N.C. 439, 443, 160 S.E.2d 320, 322-23 (1968) (citation omitted). Normally, *res ipsa loquitur* requires that the instrumentality which caused the injury to be shown to have been under the control and operation of the defendant. *See Owens v. Owens*, 766 F.2d 145, 150-51 n.9 (4th Cir. 1985) (finding doctrine of *res ipsa loquitur* inapplicable where defendant did not have control over medical equipment at issue); *Hollenbeck v. Ramset Fasteners, Inc.*, 267 N.C. 401, 404, 148 S.E.2d 287, 289 (1966) (holding that *res ipsa loquitur* inapplicable where plaintiff had used the tool for a number of years, making it unreasonable to assume that defendant had knowledge superior to plaintiff's with regard to the use or condition of the tool). However, the Supreme Court of North Carolina has recognized *res ipsa loquitur* can apply when a plaintiff eliminates the negligence of all others who had control of

22

the instrumentality causing the injury. *Kekelis*, 273 N.C. at 444-45, 160 S.E.2d at 323-24. If a plaintiff can do so, "the only inference remaining is that the fault was the defendant's, [and] the plaintiff has produced sufficient circumstantial evidence to take his case to the jury." *Id.*, 273 N.C. at 444, 160 S.E.2d at 323.

To further explain the foregoing rule, the court in *Kekelis* cited the Supreme Court of Louisiana in *Plunkett v. United Electric Service*, 214 La. 145, 36 So.2d 704, 3 A.L.R.2d 1437:

> There the defendant installed a gas heater in the attic of the plaintiff's home on December 22nd. About 10:00 p.m. on December 24th, electricity was cut off when an ice storm caused wires to break. About 6:00 a.m. on December 25th, a fire started from the heating unit and caused extensive damage to the house. The plaintiff sued for damages and relied upon the doctrine of Res ipsa loquitur even though, 'at the time of the fire, the heating unit was in plaintiff's home and under their control and management.' The trial court found that the plaintiff had not tampered with the furnace since the defendant left the premises 39 hours earlier. In awarding damages, the court said that the only logical inference was that some fault on the defendant's part had caused the fire. *After* the plaintiff had shown freedom of fault on the part of all through whose hands the instrumentality had passed after it left the defendant, the doctrine of Res ipsa loquitur then became applicable because-the court said-it was 'reasonably evident that the damage would not have been caused if the device had been free from defect and had been properly installed.'

*Kekelis*, 273 N.C. at 444, 160 S.E.2d at 323–24 (1968) (*citing Plunkett*, 214 La. at 167, 36 So.2d at 711, 3 A.L.R.2d at 1446) (emphasis added). *Plunkett* recognized the uniqueness of invoking *res ipsa loquitur* under its facts:

> It must be remembered that, in cases like this, (unlike most instances where res ipsa loquitur is invoked) the plaintiff does not obtain the benefit of the doctrine by merely showing the unusual accident and the resulting injury. On the contrary, plaintiff is required to establish with certainty that the instrumentality installed by defendant is the source of the damage; that he was without fault and that the time elapsing between the installation

23

and the damage was such as to make it reasonably evident that the damage would not have been caused if the device had been free from defect and had been properly installed.

214 La. at 167, 36 So. 2d at 711, 3 A.L.R.2d at 1446.

Here, the facts differ from *Plunkett* such that the doctrine of *res ispa loquitor* should not apply. The installation work for the replacement engine was completed on the Tractor at Strickland's Auto's shop on April 13, 2016. (*See* Compl. ¶¶ 36-37; Ivan Ruman Collins Dep., Docket Entry 27-4 at 3-4.) Ronald Bassett and another individual picked up the Tractor from Strickland's Auto on April 29, 2016 and drove the Tractor back to the Bassetts' property, stopping at an Applebee's. (Bassett Gutters' Interrog. Resp. Nos. 6 & 7, Docket Entry 27-6 at 5; R. Bassett Interrog. Resp. Nos. 6 & 7, Docket Entry 27-7 at 4-5.) On May 20, 2016, approximately three weeks later, two members of the Bassett family washed the Tractor and Ronald Bassett moved it into the Garage. (R. Bassett Interrog. Resp. No. 7, Docket Entry 27-7 at 5.) The fire occurred the same day, resulting in damages. (R. Bassett Interrog. Resp. No. 9, Docket Entry 27-7 at 7.) Farm Bureau's investigators concluded that the fire initiated in the engine compartment of the Tractor near the alternator, more specifically, due to improper installation of electrical wiring. (Ivan Ruman Collins Dep., Docket Entry 29-1.)

Viewing the facts in favor of the nonmoving party, the evidence does not demonstrate that the Tractor was in the possession and control of Strickland's Auto at the time of the fire to support the application of the *res ipsa* doctrine. The Bassetts retrieved the Tractor from Strickland's Auto's shop approximately three weeks prior to the fire, drove it back to the Bassetts' property, where it remained until the date of the fire. *See Poindexter v. Sanco Corp.*, 44 N.C. App. 694, 700, 262 S.E.2d 333, 338 (1980) (citation omitted) ("It is a well settled rule that

24

Res ipsa loquitur does not apply where the instrumentality causing the injury is not under the exclusive control or management of the defendant."). Nor do the undisputed facts demonstrate that Farm Bureau has negated fault of all through whose hands the Tractor has passed since if left Strickland's Auto's shop. *Kekelis*, 273 N.C. at 444-45, 160 S.E.2d at 323-24. Again, Strickland's Auto relinquished possession to Ronald Bassett and his agent, the Tractor was driven from Cana, Virginia to Winston-Salem, North Carolina, it thereafter sat nearly three-week time period before being washed by members of the Bassett family, and was then moved into the Garage by Ronald Bassett shortly before the fire started. There is no evidence here that the Bassetts and their agents were free from all fault. As such, Strickland's Auto's motion for summary judgement as to this issue should be granted and Farm Bureau's negligence claim under the doctrine of *res ipsa loquitur* should be dismissed.

### 3. Farm Bureau's Breach of Warranty/Contract Claim under the UCC

Strickland's Auto next contends that Farm Bureau's third cause of action—breach of warranty/contract under the UCC—should be dismissed since the UCC does not apply to the Transaction between the Bassetts and Strickland's Auto as memorialized by the Repair Order. (Docket Entry 28 at 18-19.) Strickland's Auto contends that the Transaction constitutes a contract for services rather than the sale of goods, thus the UCC does not apply. (*Id.*) Strickland's Auto further argues that because the Bassetts failed to adhere to the warranty provision requiring return of the Tractor engine, the Bassetts, and thereby Farm Bureau, have forfeited any right to recover under the warranty. (*Id.* at 19-20.)

The UCC governs transactions in goods and does not govern contracts that are for the provision of services. N.C. Gen. Stat. § 25-2-102; Va. Code Ann. § 8.2-102; *see also Hensley v.*

*Ray's Motor Co. of Forest City, Inc.*, 158 N.C. App. 261, 265, 580 S.E.2d 721, 724 (2003). However, the UCC also governs transactions involving "certain mixed contracts for goods and services." *Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 832 (4th Cir. 1998). The Fourth Circuit and North Carolina courts consider the predominant purpose test, a factual inquiry to determine whether the contract involved principally the sale of goods or the provision of services. *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 458-60 & n.11 (4th Cir. 1983); *Hensley*, 158 N.C. App. at 265-66, 580 S.E.2d at 724-25. In making such a determination, a fact finder considers three factors: "(1) the language of the contract, (2) the nature of the business of the supplier, and (3) the intrinsic worth of the material involved." *Coakley,* 706 F.2d at 460; *Hensley*, 158 N.C. App. at 266, 580 S.E.2d at 724-25.[11]

Here, viewing the facts in light most favorable to Farm Bureau, a factfinder could reasonably conclude that the Transaction predominantly concerned the sale of goods, which precludes summary judgment on this issue. As to the first *Coakley* factor, while the underlying agreement was to replace the tractor engine, it is unclear whether the predominant purpose was for the purchase of the replacement parts or the actual service in replacing the engine. The only memorialization of the Transaction provided by either party is the Repair Order which, by name, is indicative of a services contract.[12] (Repair Order, Docket Entry 1-1.)

---

[11] Lower courts in Virginia have also considered the "predominance" factor of mixed contracts. *See Stoney v. Franklin*, 54 Va. Cir. 591 (2001) ("If a contract involves both goods and services, it qualifies as a UCC contract only if its 'predominant thrust' is the purchase of goods 'with labor incidentally involved.'"); *Genito Glenn, L.P. v. Nat'l Hous. Bldg. Corp.*, 50 Va. Cir. 71 (1999) (considering *Coakley* predominant test factors); *Fournier Furniture, Inc. v. Waltz-Holst Blow Pipe Co.*, 980 F. Supp. 187, 189 (W.D. Va. 1997) (considering predominance test and applying "such factors as the language of the contract, the structure of the compensation, and the ratio of material supplied to labor expended").

[12] The Court notes that the Repair Order exhibit is a carbonless copy paper facsimile and is somewhat illegible.

However, the Repair Order lists itemized parts with pricing that the Bassetts' purchased but does not include any writing in the "Description of Work" section. (*See id.*) The Repair Order further lists the cost of "labor only" and "parts" separately, and language regarding warranties against "Major Engine Failure" and regarding refunds and exchanges on electrical/nonelectrical parts. (*Id.*) All together, the language of the Repair Order is unclear as to whether the Transaction was predominately for the sale of goods or the rendition of services.

The second *Coakley* factor—the nature of Strickland's Auto's business—is also inconclusive based on the evidence before the Court. While the full name of Strickland's Auto's business, "Strickland's Auto & Truck Repairs, Inc.," suggests that Strickland's Auto primarily provides repair services for automobiles and trucks, portions of its website suggests otherwise. It lists 21 categories of featured products and touts the sale of such products in various sections and specific pricing of such items. (*See* Strickland Website Content, Docket Entry 29-2.) As such, it is unclear as to the true nature of Strickland's Auto's business at this time.

Finally, the third *Coakley* factor—the intrinsic worth of the materials supplied—leans towards the Transaction being a sale of goods. As listed on the Repair Order, the replacement parts provided by Strickland's Auto were valued at $7,987.40 while labor was valued at $4,500. (Repair Order at 1; *see also BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1330 (11th Cir. 1998) ("When . . . the charge for goods exceeds that for services, the contract is more likely to be for goods.").) However, while the intrinsic worth of the replacement parts is greater than the services, this alone does not determine whether the predominant purpose of the

27

Transaction is for the sale of goods. *See Smart Online, Inc. v. Opensite Techs., Inc.*, No. 01 CVS 09604, 2003 WL 21555316, at *2 (N.C. Super. June 17, 2003) (unpublished) (citation omitted) ("Courts have examined several factors under [predominant factor] test but have not found any one factor to be dispositive of the issue."). In sum, genuine issues of material fact remain as to the *Coakley* factors, thus precluding a finding that the Transaction was predominantly for the purpose of providing services as a matter of law.[13] Accordingly, Strickland's Auto is not entitled to summary judgment on Farm Bureau's third cause of action.

Strickland's Auto also argues that Farm Bureau's third cause of action should be dismissed because the Bassetts failed to adhere to plain meaning of the terms of the warranty provision in the contract. (Docket Entry 28 at 19-20.) More specifically, Strickland's Auto contends that the Bassetts never returned the replacement engine to Strickland's Auto's shop as required by the written warranty, thus the warranty is unenforceable. (*Id.* at 20.) Farm Bureau argues that it is entitled to pursue all available remedies under the UCC. (Docket Entry 29 at 17-18.)

More specifically, Farm Bureau contends that the express 60-day warranty against major engine failure in the Repair Order is "altogether silent as to what remedies are provided in the event of such engine failure." (*Id.* at 18.) Relying on the North Carolina UCC, Farm

---

[13] The undersigned further notes that the Court in *Princess Cruises* also gave consideration to the fact that the plaintiff's complaint arose from the defendant's deficient services rather than the furnishing of deficient parts. 143 F.3d at 834. Here, Farm Bureau's Complaint alleges that the replacement engine and associated parts was the "predominate purpose of the transaction" (Compl. ¶ 90) and further alleges that improper installation of electrical wiring during installation of the replacement engine was the proximate cause of the Bassetts' injuries. (Compl. ¶¶ 51, 52, 66-67, 94.) Unlike *Princess Cruises*, Farm Bureau's Complaint here provides no further clarity on the issue of whether, as a matter of law, that the sale of goods or a provision of services dominated the contract.

Bureau contends that such warranty is not limited to any specific remedy, thereby entitling Farm Bureau to all remedies provided for in the UCC. (*Id.*; *see also* N.C. Gen. Stat. § 25-2-719(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.") Farm Bureau further relies upon North Carolina law which presumes that, in the absence of a clear expression to the contrary, remedies are cumulative rather than exclusive, under the terms of an express warranty. *See* N.C. Gen. Stat. § 25-2-719(1)(b) ("resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.") As Farm Bureau argues, "[t]o strictly adhere to the express language of the 'warranty' provided would effectively strip the Bassetts and Farm Bureau of any relief causing the 'warranty' to fail of its essential purpose." (Docket Entry 29 at 18.)

Here, the undersigned has previously concluded that genuine issues of material fact exist regarding the UCC's applicability here. Because the basis of Farm Bureau's instant argument, too, turns on the application of the UCC, a finding in favor of Strickland's Auto on this issue at summary judgment is inappropriate. Thus, the motion should be denied as to this argument.

### 4. Farm Bureau's Negligence Claim

Lastly, Strickland's Auto argues that Farm Bureau's First Cause of Action—negligence—should be dismissed because the claims here arise solely out of an alleged breach of contract, not negligence. (Docket Entry 28 at 21-22.) Farm Bureau argues that the economic loss rule does not bar its negligence claims because Strickland's Auto's negligence caused damage to property beyond the Tractor's engine, and to property owned by persons

other than Bassett Gutters, the promisee of the contract. (Docket Entry 29 at 10-12.) The undersigned agrees with Farm Bureau.

Under the economic loss rule, in general, a breach of contract claim will not support the assertion of tort claims as well. *Schumacher Immobilien Und Beteiligungs AD v. Prova, Inc.,* No. 1:09CV18, 2010 WL 2867603, at *8 (M.D.N.C. Jul. 21, 2010) ("It is well settled under North Carolina law that a mere breach of contract cannot sustain claims sounding in tort.") (unpublished), *recommendation adopted*, 2010 WL 3943754 (M.D.N.C. Oct. 7, 2010) (unpublished); *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.,* 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978) ("Ordinarily a breach of contract does not give rise to a tort action by the promisee against the promisor.") (citation omitted), *rejected in part on other grounds by Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assoc,* 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985). "This is true even where the failure to perform the contract is due to the negligent or intentional conduct of the party and the injury resulting from the breach is the subject of the contract." *Modern Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 545 (M.D.N.C. 2019), *aff'd*, No. 19-2143, 2021 WL 164681 (4th Cir. Jan. 19, 2021).

The North Carolina Court of Appeals held that "[i]t is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation." *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 43, 587 S.E.2d 470, 476 (2003). "The rationale for the economic loss rule is that the sale of goods is accomplished by contract and the parties are free to include, or exclude, provisions as to the parties' respective rights and remedies, should the product prove to be defective." *Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 401-02, 499 S.E.2d 772, 780 (1998). Therefore, "a tort action must be grounded on a violation

30

of a *duty* imposed by operation of law, not a violation of a duty arising purely from the contractual relationship of the parties." *City of High Point, N. Carolina v. Suez Treatment Sols. Inc.*, No. 1:19CV540, 2020 WL 1307017, at *5 (M.D.N.C. Mar. 19, 2020) (unpublished) (internal quotation marks and citation omitted).

There are, however, four exceptions to the economic loss rule if the injury proximately caused by the promisor's negligence:

> (1) was an injury to the person or property of someone other than the promisee[;]
>
> (2) was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee[;]
>
> (3) was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, innkeeper or other bailee[; or]
>
> (4) was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor.

*Ellis v. La.-Pac. Corp.*, 699 F.3d 778, 783-84 (4th Cir. 2012) (quoting *N.C. State Ports Auth.*, 294 N.C. at 82, 240 S.E.2d at, 350-51).

Here, the first and second exceptions are applicable. First, there was an injury to the person or property of someone other than the promisee. The Repair Order was in regard to the Replacement engine in the Tractor owned by Bassett Gutters. However, in addition to Strickland's Auto's alleged negligence that caused the fire damage to property owned by Bassett Gutters, the fire also damaged property belonging to the Bassetts in general. (Ronald Bassett's Interrog. Resp. Nos. 4 & 14, Docket Entry 27-7 at 3, 11.) And even if the first

exception were not applicable here, the second exception is more clearly evident. Strickland's Auto's purported negligence caused damage to property other than the Tractor's replacement engine (and associated parts), which were the subject of the Repair Order. There was damage to the Bassetts' Garage and specialized equipment, cars, tools, and other machinery. (*Id.*; *see also Severn Peanut Co. v. Indus. Fumigant Co.*, 826 F. Supp. 2d 871, 874 (E.D.N.C. 2011) (applying second exception to the economic loss rule).) Thus, because there are exceptions applicable here to the economic loss rule, Strickland's Auto's motion for summary judgment as to Farm Bureau's First cause of action for negligence should not be granted.

## V. CONCLUSION

For the reasons stated herein, **IT IS HEREBY RECOMMENDED** that Farm Bureau's Motion for Partial Summary Judgment (Docket Entry 20) be **GRANTED to the extent** Strickland's Auto's First, Second, and Third Affirmative Defenses (related to Farm Bureau's subrogation rights pertaining to Bassett Gutters) be dismissed, but the motion be otherwise **DENIED**.

**IT IS FURTHER RECOMMENDED** that Strickland's Auto's Motion for Summary Judgment (Docket Entry 27) be **GRANTED** to the extent that Farm Bureau's second cause of action for negligence under the doctrine of *res ipsa loquitur* be dismissed, but otherwise **DENIED** in all other aspects.

_____
Joe L. Webster
United States Magistrate Judge

February 18, 2021
Durham, North Carolina